Donald Charles Schwartz, Esq. [SBN 122476]
Law Offices of Donald C. Schwartz
7960-B Soquel Drive, No. 291
Aptos, CA  95003
831-331-9909/Fax: 815-301-6556
email: triallaw@cruzio.com

Attorney for Plaintiff
Mark Esquibel

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK ESQUIBEL,<br><br>      Plaintiff,<br><br>      v.<br><br>KINDER MORGAN ENERGY PARTNERS L.P.; SCOTT MANLEY; KINDER MORGAN, INC.; and DOES 2 through 100, inclusive,<br><br>      Defendants. | Case No. 3:21-cv-02510-WHO Hon. William H. Orrick<br><br>**PLAINTIFF MARK ESQUIBEL'S THIRD AMENDED COMPLAINT**<br><br>1. WRONGFUL TERMINATION AS A MATTER OF PUBLIC POLICY<br><br>2. PROMISSORY FRAUD<br><br>**JURY TRIAL DEMANDED** |

TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................. 2

II. JURISDICTION .................................................................................................... 5

III. VENUE .................................................................................................................. 5

IV. PARTIES ............................................................................................................... 5

    A. Plaintiff ........................................................................................................... 5

    B. Defendants ...................................................................................................... 5

    C. Doe Defendants .............................................................................................. 6

V. FACTS ................................................................................................................... 6

    A. Background on Kinder Morgan ...................................................................... 6

    B. The Deadly 2004 Explosion in Walnut Creek ................................................ 7

    C. Esquibel Accomplished Success In The Task For Which He Was Hired – Bringing Kinder Morgan Back Into Good Standing After The Felony Convictions ...................................................................................................... 7

    D. The Corrosion Problem ................................................................................... 8

    E. 'B-Sleeves' and the Need to Dig Them Up ..................................................... 9

    F. 'Smart Pigs' and the Data Showing 20% B-Sleeve Anomalies ...................... 9

    G. Esquibel's Determination to Obey PHMSA Safety Regulations vs. Kinder Morgan's Cost-Cutting Policy ...................................................................... 10

    H. 'Poke-n-Sniff' Is Unreliable Guesswork ....................................................... 11

    I. 'Clock Springs' Are Unreliable 'Band Aids' ................................................. 11

    J. Kinder Morgan's False Promise of Insurance .............................................. 12

    K. Kinder Morgan's Racist Corporate Culture ................................................. 12

VI. CAUSES OF ACTION ....................................................................................... 13

FIRST CAUSE OF ACTION .................................................................................... 13

SECOND CAUSE OF ACTION .......... **ERROR! BOOKMARK NOT DEFINED.**

VII. PRAYER FOR RELIEF ..................................................................................... 16

VIII. JURY TRIAL DEMAND ................................................................................... 17

## I. INTRODUCTION

1. This case is about an extremely dangerous situation regarding the corrosion of high-pressure jet fuel pipelines. It is also about the wrongful, retaliatory termination of whistleblower Plaintiff Mark Esquibel ("Esquibel") by his now-former employer, Defendants Kinder Morgan Energy Partners, L.P. and its Pacific Northern Region Director of Operations Scott Manley (collectively "Kinder Morgan").

2. Esquibel is a State and Federally badged Incident Commander for the petroleum and natural gas industries. In the 2004 aftermath of a pipeline explosion in Walnut Creek, CA that killed 5 people, Esquibel was hired to remedy felony criminal charges brought by the California State Attorney General's Office against Kinder Morgan. Without resolution of these criminal charges, defendant Kinder Morgan's fuel pipelines would be, *inter alia*, precluded from servicing various military installations. Over his ensuing 12-year career at Kinder Morgan, Esquibel performed flawlessly, thereby satisfying all government requirements and putting Kinder Morgan back on the right track. Under plaintiff Esquibel's supervision the prior felony charges against Kinder Morgan were reduced to misdemeanors.

3. Nevertheless, Esquibel was fired from his position as a Right-of-Way Specialist after he discovered and sought to remedy another very dangerous situation involving corrosion of underground piping which carries jet fuel between the Oakland and San Francisco airports. Specifically, Esquibel became aware of corrosion to a piping component known as a "B-Sleeve." A jet fuel leak from the B-Sleeve could cause an environmental disaster, or an explosion, or both (hereafter the "B-Sleeve Corrosion Problem" or simply "Corrosion Problem").

4. Esquibel implored upon Kinder Morgan to take remedial action by digging up and replacing the corroded B-Sleeves, as government safety regulations and common sense require. But Kinder Morgan decided it was too expensive, that its stock market performance was more important, and deliberately failed to remedy the Corrosion Problem. Instead of taking appropriate (albeit costly) remedial measures, Kinder Morgan employed the use of so-called

2

'Clock Springs,' a brand name for a composite wrap that is wrapped around a corroded or damaged pipe. Esquibel believes, and on that basis alleges that Clock Springs are a temporary "band-aid" measure that may delay but not prevent the jet fuel leakage he is worried about.

5.      Knowing that Kinder Morgan receives both Federal and California State funding, and in light of Kinder Morgan's placing the public in great danger by refusing to acknowledge and remedy the Corrosion Problem, Esquibel informed the Cal State Fire Marshal ("CSFM") of the situation such to "blow the whistle." For that reason, Kinder Morgan fired Esquibel.

6.      Silencing the whistleblower was the main reason, but not the only reason Kinder Morgan fired Esquibel. Prior to the Corrosion Problem, Esquibel had been targeted as the lead organizer to unionize California employees ("IBEW"). Esquibel gave up when Kinder Morgan made it known to Esquibel that union-organizing tactics were not tolerated within the corporate culture. Kinder Morgan went so far as to develop a "training" program for its managers (and higher-ups) entitled "Keep Kinder Morgan Union Free."

7.      The corporate culture at Kinder Morgan is also defined by overt racism. Esquibel is of American Indian and Hispanic heritage and happened to have been in a relationship with a Black woman during the relevant time period. Esquibel attended several Kinder Morgan work meetings and social events and was shocked to hear the "N-Word" casually bandied about by employees that Scott Manley used to target Esquibel and others within the company. On three separate occasions, Esquibel reported the racial slurs to his immediate supervisor and to Human Resources to no avail.

8.      Kinder Morgan management use racial epithets, not just to offend, but to bully. As to Esquibel, racial epithets were invoked in Kinder Morgan's overall scheme to intimidate him, to defeat what they contended were Esquibel's union-organizing efforts, to cover up the Corrosion Problem, and ultimately, to wrongfully terminate him.

9.      The "straw that broke the camel's back" was a DMV records request made via email by a Kinder Morgan secretary in Colorado in 2018. The email asked all Kinder Morgan employees to consent to a background check, including a DMV records request.  Esquibel had no problem

3

with the DMV and background check *per se*, but naturally wanted assurances that his personal information would not be misused, a practice now popularly known as "doxing." For this reason, Esquibel and many other employees requested written confirmation from Kinder Morgan that any personal information obtained in this background check would not be released to any third-party outside of Kinder Morgan (the "confidentiality request").

10.  Plaintiff Esquibel's assurance of confidentiality was refused by Scott Manley and the Human Resource Department at Kinder Morgan. Defendants, and each of them, were told by many company employees that Kinder Morgan was not using a proper DMV form (i.e., were using a homemade form that would never have been acknowledged by the California DMV, but instead raised issues that the company was using the DMV driving records check as a ruse to engage full background investigations and then doxing).

11.  Thus, Esquibel and many others in the company initially refused to consent to the so-called DMV driving records check request due to a history of doxing within the company. In fact, defendant Manley had been doxing others in the company and causing them to quit. The DMV driving records issue was used to threaten and intimidate Esquibel and the other company employees. Defendant Manley used the issue to target plaintiff Esquibel by immediately suspending Esquibel from his employ without pay. (Two days later defendant Kinder changed the employment suspension with pay, pending the doxing investigation.)

12.  After the proper State of California DMV records form was obtained by defendant Kinder Morgan, plaintiff Esquibel agreed to the DMV records pull and provided the filled-out DMV form to the Human Resources Department, even though defendant Kinder Morgan had yet to provide any confidentiality assurances. Despite having been assured that he had complied with the DMV driving record check, suddenly, without warning, defendant Scott Manley told Esquibel to return his company truck and find his own way home. Defendants Manley and Kinder Morgan then fired Esquibel one-week prior to receiving his annual bonus for 2018. The termination of plaintiff Esquibel enabled defendant Manley to redirect plaintiff Esquibel's bonus to defendant Manley's racist and misogynistic alliances that he aligned himself with

within the company after he moved to California from Maricopa County, Arizona.

13. Esquibel believes, and on that basis alleges that he was fired in retaliation against him and to prevent him from exposing wrongful conduct of Kinder Morgan ("Whistleblowing"), including the DMV/background check issue, the alleged union-organizing, the discriminating annual bonus issue, and most of all, the Corrosion Problem and Kinder Morgan's continued disobedience of PHMSA safety regulations.

## II. JURISDICTION

14. Original federal question jurisdiction under 28 U.S.C. § 1331 is vested in the District Court by the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733. Diversity jurisdiction was established in Defendants' prior Notice of Removal from the Superior Court (Dkt. #1), which alleged complete diversity of citizenship and an amount in controversy greater than $75,000. Plaintiff did not challenge removal. Alternatively, the Court should also exercise supplemental jurisdiction over any state law claims because they arise from the same nucleus of operative facts as the federal claims, such that they form the same case or controversy.

## III. VENUE

15. Venue is proper in the San Jose Division of the Northern District of California as chosen by Defendants in their Notice of Removal. Citing 28 U.S.C. §§ 1441(a),1446(a); and Local Rule 3-2(e), Defendants assert that venue assignment to the San Jose Division is proper because the state action filed by Plaintiff was pending in Santa Clara County Superior Court and arose in Santa Clara County. Plaintiffs do not challenge Defendants' choice of venue.

## IV. PARTIES

### A. Plaintiff

16. **Plaintiff**: MARK ESQUIBEL is an individual, a federal and state badge-holding Incident Commander and former employee of KINDER MORGAN.

### B. Defendants

17. **Defendant:** KINDER MORGAN ENERGY PARTNERS L.P.

5

18. **Defendant:** SCOTT MANLEY is an individual with the title of Pacific Northern Region Director of Operations at Kinder Morgan.

19. **Defendant:** KINDER MORGAN, INC. is believed to be the corporate parent of KINDER MORGAN ENERGY PARTNERS L.P.

### C. Doe Defendants

20. **Doe Defendants:** Individuals, unknown at this time, but who were involved in the scheme to cover up PHMSA regulatory violations, and/or to smear Esquibel as a false pretext for firing an employee with a spotless record.

## V. FACTS

### A. Background on Kinder Morgan

21. Kinder Morgan, Inc. is one of the largest energy infrastructure companies in North America. The company specializes in owning and controlling oil and gas pipelines and terminals.

22. According to Wikipedia, Kinder Morgan owns an interest in or operates approximately 85,000 miles of pipelines and 152 terminals. The company's pipelines transport natural gas, liquefied natural gas, ethanol, biodiesel, hydrogen, refined petroleum products (gasoline, jet fuel), crude oil, carbon dioxide and more. Kinder Morgan also stores or handles a variety of products and materials at their terminals such as gasoline, jet fuel, ethanol, coal, petroleum coke and steel.

23. According to its own website at https://www.kindermorgan.com/Safety-Environment/Safety, Kinder Morgan's pipeline operating conditions are monitored 24 hours a day, 7 days a week by personnel in control centers using a Supervisory Control and Data Acquisition (SCADA) computer system. This electronic surveillance system gathers such data as pipeline pressures, volume and flow rates and the status of pumping equipment and valves. Whenever operating conditions change, an alarm warns the operator on duty and the condition is investigated. Both automated and manual valves are strategically placed along the pipeline

6

system to enable the pipeline to be shut down immediately and sections to be isolated quickly, if necessary.

24. Multiple pipelines running from Kinder Morgan facilities in Richmond and Concord California deliver fuel to San Francisco Airport, Oakland Airport, San Jose Airport, Travis Air Force Base, any many other energy customers in the Bay Area.

### B. The Deadly 2004 Explosion in Walnut Creek

25. In 2004 five people died in Walnut Creek California when a 10" Kinder Morgan pipeline on Broadway exploded. The explosion occurred during an excavation operation and was caused by the mechanical jaws of a backhoe striking a high-pressure (1100 PSI) jet fuel pipeline.

26. As a consequence of the Walnut Creek explosion incident, Kinder Morgan was convicted of six felony counts, and put on probation for 3 years by the Pipeline and Hazardous Materials Safety Administration ("PHMSA").

27. Another consequence of the Walnut Creek explosion incident was implementation of the "10 and 2 Rule". Codified at Cal. Gov. Code § 4216, and Cal. OSHA § 1541, the 10-and-2 Rule holds that no mechanical digging may take place within 10 feet of a pipeline until the utility location is precisely verified, and then not within 2 feet.

### C. Esquibel Accomplished Success In The Task For Which He Was Hired – Bringing Kinder Morgan Back Into Good Standing After The Felony Convictions

28. After the Walnut Creek explosion, Kinder Morgan had a big problem on its hands – felony convictions and PHMSA probation. Esquibel was hired as Right-of-Way Specialist specifically to complete the probationary task of compliance, thereby reducing Kinder Morgan's felony to a misdemeanor. If there was any probation violation, Kinder Morgan ran the risk of being disqualified from all governmental jet fuel contracts to all the military installations and airports that it services.

29. Kinder Morgan had great confidence in Esquibel's ability to succeed in this very

7

important responsibility. Providing an executive relocation package, in or about 2008, defendants induce Esquibel to move his family from Rocklin, California to the Bay Area/Santa Cruz area, including a down-payment on Esquibel's new house in Santa Cruz.

30. Working directly under Pete Murphy and Esquibel and his team set about to bring Kinder Morgan into compliance with regulatory safety standards throughout operations in the greater Bay Area.

31. Esquibel earned a reputation as being a "compliance guy." Esquibel enforced the 10-and-2 rule 'to a tee'. Pete Murphy was very supportive of Esquibel's uncompromising approach to safety compliance.

32. Esquibel and his team accomplished the goal of bringing Kinder Morgan into compliance, and the prior felony probation was reduced to a misdemeanor, alleviating the possibility that Kinder Morgan would lose its federal contracts.

33. Esquibel received praise from Rich Kinder, Tom Bannigan and Ron McClain – Kinder Morgan's CEO, President and Vice President, respectively.

### D. The Corrosion Problem

34. Esquibel and his team had a perfect record for 13 years zero Notices of Violation ("NOV"), zero Pipeline Hits, and zero Leaks operationally in the Bay Area.

35. Having worked with Pete Murphy for over a decade, Esquibel was well aware that Murphy and Defendant Scott Manley did not see eye-to-eye on safety compliance. Murphy used to complain regularly that Scott Manley would put pressure to cut costs, even if it meant putting the public at risk.

36. Tragically, on June 22, 2017, Pete G. Murphy died of a heart attack. Esquibel believes that Pete Murphy's death is attributable to the stress caused by defendant Scott Manley. This is when Esquibel began working directly for Scott Manley and experiencing exactly the same "cost over safety" pressure from Scott Manley that Pete Murphy had been stressed out about for so long.

8

37. In 2018, one of Kinder Morgan's chief concerns was the Corrosion Problem. Many of the pipelines delivering energy products were well over 50 years old, and corroding. Corrosion in a fuel pipeline is an issue because it gradually reduces the wall thickness of the pipeline.

38. Wall thickness is important because it determines how much fuel can safely be pumped in a given amount of time. For example, a standard wall thickness of .188 inches can safely operate at 1100 pounds per square inch ("PSI") of pressure. If there is a loss of wall thickness due to corrosion, PHMSA regulations dictate that pressure must be reduced until such time as the corrosion is remedied.

39. Therein lies the rub for Scott Manley and Kinder Morgan. Reducing the amount of pressure on a fuel delivery pipeline means less fuel is delivered. Less fuel delivered means less revenue. Less revenue means lower stock market price. To keep the pressure up on fuel delivery, Scott Manley keeps the pressure up on employees to violate safety regulations.

### E. 'B-Sleeves' and the Need to Dig Them Up

40. A 'B-Sleeve' is metal collar that entirely surrounds a corroded portion of a pipeline and is welded into place. A B-Sleeve is expected to function safely at full pressure for approximately 30 years.

41. Back in the 1990s, to remedy corrosion that had been detected back then, Kinder Morgan installed approximately 300 B-Sleeves on pipelines around the Bay Area. At all relevant times Kinder Morgan knew that maintaining the proper, *safe* function of energy pipelines is essentially a never-ending process.

### F. 'Smart Pigs' and the Data Showing 20% B-Sleeve Anomalies

42. A 'Smart Pig' is a sophisticated 16' to 20' long device that travels inside of fuel pipelines, taking measurements and collecting data about wall thickness, corrosion or other defects or anomalies that could compromise the integrity of the line.

43. In 2018-2019 over multiple high-level meetings, Kinder Morgan's Director of Integrity Management out of Houston reported corrosion data collected by Smart Pigs.

44. Kinder Morgan's Smart Pig data indicated that 20% of the B-Sleeves in the Bay Area have corrosion and loss of wall thickness sufficient to require an immediate reduction in pressure, and remedial action prior to increasing the pressure back up to 1100 PSI.

45. Because he had more than a decade of Incident Commander experience under his belt, with a flawless safety record, and had successfully gotten Kinder Morgan "out of hot water" regarding the Walnut Creek explosion incident and had received praise from top company executives for doing so, Esquibel was given Project Manager responsibility (not in his job description) over the B-Sleeve Remediation Project in the Bay Area.

### G. Esquibel's Determination to Obey PHMSA Safety Regulations vs. Kinder Morgan's Cost-Cutting Policy

46. Regarding the ongoing Corrosion Problem, Esquibel intended to continue doing exactly what he had been doing – insisting on taking whatever remedial measures were required to maintain strict compliance with safety regulations. Unfortunately, this conflicted with Scott Manley's idea – which was to favor cost-cutting over compliance.

47. "Verification" refers to the process whereby the precise location of a B-Sleeve becomes known.

48. Esquibel determined that various B-Sleeves needed to be dug up and inspected to determine which ones needed to be cut-out, remediated and/or replaced. This method of inspection and verification is very dependable because the professional can observe the pipeline directly.

49. At least two B-Sleeves were cut out and replaced. An anomaly was discovered in a B-Sleeve directly under a railroad track just north of the Montague Expressway. This "anomaly dig" and cut out was undertaken in or about 2019 because an explosion could threaten the Union Pacific Railroad.

50. Also in or about 2019, a B-Sleeve near the Carquinez Bridge was dug up, remediated with two Clock Springs and replaced. Besides threatening the bridge itself, a leak in that location would likely result in fuel leaking right down into the San Francisco Bay.

51. However, there are at least 8 B-Sleeves in the pipelines serving the Oakland and San Francisco airports. These 10" and 12" lines run under the water, under shipping channels. Esquibel determined that these B-Sleeves must be dug up, inspected, and where necessary, cut out, remediated and/or replaced.

52. However, Scott Manley and Kinder Morgan favor cost-cutting over compliance. First, any cut out causes an 18–24-hour shut down, which costs money. Second, compliance with California's Cal-OSHA safety regulations are more involved and require more crew personnel (thus are more costly) than compliance in other States, e.g. Kinder Morgan's home State of Texas.

### H. 'Poke-n-Sniff' Is Unreliable Guesswork

53. Instead of digging up the B-Sleeves, Scott Manley and Kinder Morgan overruled Esquibel, and employed the "Poke-n-Sniff" method of inspection. Poke-n-Sniff refers to the process of determining the approximate location of the B-Sleeve with a GPS ("Trimble") device and inserting a tube into the ground, typically only 4 feet down. A gas-detecting probe known as a "Sniffer" or "Eagle" is inserted down tube through a hole created by a probe. The Sniffer can detect fuel leaks by detecting various types of hydrocarbon gas fumes, which fumes fuel leaks will invariably produce (i.e., 50-500 parts per million (PPM) would initiate a dig-up).

54. Compared to digging, Poke-n-Sniff is less expensive, but also far less dependable as a method to detect leaks. This is because relying on GPS to locate the B-Sleeve can yield errors of between 2-100 feet. Using Poke-n-Sniff, a significant fuel leak can easily be overlooked, simply because the Sniffer was "sniffing" in the wrong place.

55. Once Scott Manley and Kinder Morgan became familiar with the cost associated with digging up B-Sleeves in California, they decided to forego that expense whenever they thought they could get away with it, safety regulations notwithstanding.

### I. 'Clock Springs' Are Unreliable 'Band Aids'

56. Another significant example of Kinder Morgan's policy of cost-cutting over compliance relates to the use of "Clock Springs." "Clock Spring" is a brand name for a type of non-metal, composite wrapping, or "band aid" around a damaged or corroded pipeline. A Clock Spring is a temporary 5-year fix.

57. Installed some 20 years ago, there are approximately 19 Clock Springs on the 12" jet fuel pipeline in the Bay water. True to their namesake, Clock Springs are indeed "ticking time bombs." It is only a matter of time before disaster strikes *again.*

### J.  Kinder Morgan's False Promise of Insurance

58. Kinder Morgan management informed Esquibel that he was insured when he did the annual pilot training and when he drove a company vehicle. Esquibel had numerous times requested the written policy but was never provided with any information.

59. In August 2013 Esquibel was involved in a no-fault accident in the company truck and suffered a concussion. Esquibel was out of work until December 2013 at which time he was forced to return to work or go on disability because his job would not be held for longer than 6-months. Esquibel learned within one year of the filing of this action that he was not fully insured by Kinder Morgan while driving the company truck.

### K.  Kinder Morgan's Racist Corporate Culture

60. Between 2008 and 2018, on many occasions, Colin Kaepernick was called the 'N' word in Esquibel's presence. President Obama and Michelle were called the 'N' word and Michelle Obama was called a 'monkey' during a corporate meeting. Esquibel reported this to his immediate supervisor and HR.

61. In 2017 when Scott Manley became the 5th director in less than 12 years for the Pacific Northern Region, he immediately made it known to management and employees that, referring to Esquibel, he was going to 'tune him up'. Esquibel believes, and on that basis alleges that "tune him up" means to intimidate Esquibel into conformity with the custom and policy of Kinder Morgan which tolerates racism, doxing, and allowing dangerous situations like the 2004 Walnut Creek explosion, and the Corrosion Problem.

## VI.  CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**Wrongful Termination as a Matter of Public Policy**

62. Plaintiff repeats and incorporates by reference all facts alleged above.

63. The California Labor Code states in relevant part:

"An employer, or any person acting on behalf of the employer, shall not make, adopt, or enforce any rule, regulation, or policy **preventing an employee from disclosing information to a government or law enforcement agency**, to a person with authority over the employee, or to another employee who has authority to investigate, discover, or correct the violation or noncompliance, or from providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, **if the employee has reasonable cause to believe that the information discloses** a violation of state or federal statute, or a violation of or **noncompliance with a local, state, or federal rule or regulation**, regardless of whether disclosing the information is part of the employee's job duties."

Cal. Lab. Code § 1102.5 (a), bolding added.

64. The Labor Code further states that:

"An employer, or any person acting on behalf of the employer, **shall not retaliate against an employee** for disclosing information, or **because the employer believes that the employee disclosed or may disclose information**, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

Cal. Lab. Code § 1102.5 (b), bolding added.

65. At all relevant times Esquibel repeatedly and incessantly voiced his opposition to Kinder Morgan's policy to put cost-cutting over regulatory compliance.

66. It was not "cost effective" to dig up the 20% of defective B-Sleeves and because

13

Esquibel voiced his opposition to this policy, he became a target by management - specifically Scott Manley - for wanting to implement safety over cost.

67.  Esquibel's daily concern was that there would be another explosion or environmental disaster. In addition to his concern for public safety, Esquibel is also concerned for himself. Were another disaster to eventuate, the ensuing investigation would focus on Esquibel as project manager for not remediating the Corrosion Problem, as safety regulations require.

68.  In the winter of 2018, Scott Manley and HR put Esquibel on unpaid leave due to DMV email. Scott Manley and Does spent the next few months trying to smear Esquibel's reputation and character as a false pretext on which to fire him "for cause."

69.  On January 9, 2019, Scott Manley sent a letter to Kim Dang firing Esquibel, instructing Dang to prepare Esquibel's final check which she did on January 11, 2019. On January 16, 2019 Esquibel's boss called him to meet to discuss the investigation and return to work. Esquibel was unable to meet that date due to a prior conflict. Esquibel later learned that technically they had already fired him on January 9th and this was another tactic of the hostile work environment and targeted harassment that is the policy and custom of Kinder Morgan.

70.  Esquibel has personal knowledge about the 'B-Sleeve' Corrosion Problem, that Kinder Morgan is in noncompliance with state and/or federal regulations, and that Kinder Morgan is fraudulently concealing the Corrosion Problem from State and Federal regulators and procurement officials, so as to maintain and renew lucrative government contracts.

71.  Esquibel believes, and on that basis alleges that he was subjected to racial harassment and ultimately was terminated in order to retaliate against him, because Kinder Morgan believed that Esquibel would disclose information about the Corrosion Problem to government or law enforcement agencies.

72.  Therefore, Defendants are liable in an action for Wrongful Termination as a Matter of Public Policy.

## THIRD CAUSE OF ACTION
### Promissory Fraud

73. Plaintiff repeats and incorporates by reference all facts alleged above.

74. Under Cal. Civ. Code § 1709, one is liable for fraudulent deceit if he 'deceives another with intent to induce him to alter his position to his injury or risk . . . .' Cal. Civ. Code § 1710 defines deceit for the purposes of § 1709 as, inter alia, '[a] promise, made without any intention of performing it.'

75. The elements of fraud, which give rise to the tort action for deceit, or Promissory Fraud, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." [Citations.]' Each element must be alleged with particularity. *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1059-1060 [14 Cal.Rptr.3d 142], internal citations omitted.

76. In or about March 2008, when plaintiff Esquibel was promoted to the position of "Right of Way Specialist" and Proctor (i.e., trainer), plaintiff Esquibel made an inquiry as to the company's various insurance coverages. Defendant Kinder Morgan's Operations Manager Mike Rounds, and later Peter G. Murphy falsely represented to Esquibel that Kinder Morgan had full uninsured/underinsured insurance covering injuries sustained by Esquibel and damage the vehicle incurred during the course and scope of his employment.

77. Rounds, Murphy and defendant Kinder Morgan concealed the truth of the matter, i.e., that Kinder Morgan has a policy and custom to make such false representations about non-existent insurance coverages.

78. Rounds, Murphy and Kinder Morgan knew that there was no such insurance policy that would cover Esquibel's damages.

79. Rounds, Murphy and Kinder Morgan intended to induce Esquibel's reliance on the belief that he would be covered in the event of a vehicle accident, as Esquibel would not have

accepted the promotion and requiring to move his family to the SF Bay Area absent that false promise.

80. Within one year of the filing of this civil action, plaintiff Esquibel learned for the first time that defendant Kinder carried no uninsurance/underinsurance for its company employees while driving a company truck.

81. Esquibel's reliance was justifiable because it is not unusual for an employer to offer insurance coverage such as that purported by Scott Manley and Kinder Morgan, nor would it have been unusual for Esquibel to decline dangerous employment in the absence of such insurance. It was certainly reasonable for anyone to think that a company as large as defendant Kinder Morgan would not allow thousands of employees to drive within the State of California without State-mandated uninsurance/underinsurance coverage. Plaintiff Esquibel did not learn, nor could he have reasonably learned, that he had no such corporate insurance coverage within three years of the filing of this civil action or otherwise in accordance with California law.

82. Esquibel was damaged in reliance on the false promise made by Rounds, Murphy and Kinder Morgan insofar as he was physically injured with a concussion, and the vehicle was damaged. Esquibel was told that there was no insurance coverage for the accident caused by a third party while in a company vehicle because the purported uninsurance/underinsurance coverage did not actually exist.

83. Therefore, Defendants are liable for promissory fraud.

## VII.   PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief as follows:

### FIRST CAUSE OF ACTION - WRONGFUL TERMINATION

a. Economic Damages - Esquibel requests an award of economic damages to compensate him for lost wages, in an amount subject to proof at trial, but not less than $10,000,000.

b. Compensatory Damages – Esquibel requests an award of compensatory damages to

16

compensate him for the cost of obtaining new employment, subject to proof at trial, but not less than $10,000,000.

c.     Punitive damages – to the extent that the wrongful termination is found to involve conduct that amounts to fraud, malice or oppression, Esquibel seeks a punitive damage award sufficient in amount to accomplish the purposes of punitive damages.

### SECOND CAUSE OF ACTION – PROMISSORY FRAUD

a.     Economic Damages – Esquibel requests an award to compensate him for the cost of the motor vehicle accident which insurance would have covered (had the promised policy actual existed) including vehicle repairs and medical bills, in amounts subject to proof at trial, but not less than $10,000,000.

General Damages – Esquibel requests general damages for pain and suffering, in a reasonable amount, but not less than $10,000,000.

Punitive Damages - to the extent that the Defendants' conduct regarding the insurance policy is found to constitute fraud, malice or oppression, Esquibel seeks a punitive damage award sufficient in amount to accomplish the purposes of punitive damages.

### ALL CAUSES OF ACTION

a.     Attorney fees – as allowed by contract or statute

b.     Cost of the suit, plus prejudgment interest.

c.     Any other relief as the Court deems appropriate.

## VIII. JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted on July 5, 2023,

_____

Donald Charles Schwartz
*Attorney for Plaintiff Mark Esquibel*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**PROOF OF ESERVICE**

This pleading is eserved through the ECF system of the United States District Court.